# AFFIDAVIT OF SPECIAL AGENT COLLEEN PEERY BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES

I, Colleen Peery, being first duly sworn, do hereby depose and state:

## Introduction

1. I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") and have been employed in such capacity since March 2015. As a Special Agent with the ATF, I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516. I am currently assigned to the Kansas City Field Division, and I investigate criminal violations of federal laws, including Title 18, United States Code, Sections 371 (conspiracy), 922(a)(5) (interstate transport, sale and delivery of firearms by a person other than a licensed dealer), and 922(d)(1) (sale of firearms or ammunition to a convicted felon).

2. I am familiar with federal criminal laws, particularly federal firearms violations. In the performance of my duties with ATF, I have investigated and participated in numerous investigations involving federal firearms violations and the criminal activities of street gangs and drug trafficking organizations.

## Location to Be Searched

3. I write this affidavit in support of an application for a search warrant authorizing the search and forensic analysis of a black LGV20 Model L5997, cellular telephone, serial number 702KPRW0181838 (the "Device"), currently located at the Bureau of Alcohol, Tobacco, Firearms & Explosives, 901 St. Louis, Springfield, Missouri. As set forth herein, there is probable cause to believe that the Device contains the items described in Attachment A, which are evidence,

contraband, fruits of crime, other items illegally possessed, property designed for use, intended for use, or used in committing a crime all concerning violations of Title 18, United States Code, Sections 371 (conspiracy), 922(a)(5) (interstate transport, sale and delivery of firearms by a person other than a licensed dealer), and 922 (d)(1) (sale of firearms or ammunition to a convicted felon).

4. The information set forth in this affidavit has been provided to me directly or indirectly by Special Agents of the ATF, Task Force Officers of the ATF, Jefferson City Police Officers and Chicago, Illinois Police Officers. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, such information was provided by another law enforcement officer or investigator (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are among many statements made by others and are stated in substance, unless otherwise indicated. Similarly, except where indicated, information resulting from surveillance does not set forth my personal observations, but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance.

5. I make this affidavit, in part, based on personal knowledge derived from participation in this investigation and, in part, based upon information from the following sources:

    a. My experience investigating illegal firearms transfers;
    b. Oral and written reports, documents and other information about this investigation that I have received from members of the ATF, JCPD and CPD, other local law enforcement and other state/federal law enforcement agencies;
    c. Discussions I have had personally concerning this investigation with experienced investigators;
    d. Physical surveillance and electronic surveillance conducted by federal and local law enforcement agencies, the results of which have been reported to me either directly or indirectly;
    e. Public records;
    f. Telephone toll records, pen register/trap and trace information, and telephone subscriber information;
    g. Statements of confidential source(s);

2

      h.      Consensually recorded phone calls and text messages over the Device used by VICTOR NAHUM VARGAS;

      i.      Surveillance through Court-authorized phone location information, beginning in April 2018;

      j.      Surveillance through Court-authorized tracking devices, beginning in April 2018; and

      k.      Seizures of firearms sold by VICTOR NAHUM VARGAS to a convicted felon.

## Investigative Narrative

6. On or about April 12, 2018, an ATF Confidential Source (CS-1) provided information concerning the illegal trafficking of firearms by individuals in Missouri. CS-1 had been in contact via telephone with several individuals believed to be in Jefferson City, Missouri, regarding firearms.

7. On or about April 12, 2018, CS-1 began communicating with (312) 414-4395 (a T-Mobile cell phone used by DEVON DIXON). Between April 12, 2018, and April 16, 2018, during recorded communications between DIXON and CS-1, it was learned that an individual in Jefferson City, Missouri (later identified as VICTOR NAHUM VARGAS) could obtain firearms legally. On or about April 12, 2018, DIXON provided CS-1 a picture text message depicting two Glock firearms and two rounds of ammunition that DIXON said were for sale in Missouri. The firearms appear to be a Glock, Model 20, 10mm pistol, and a Glock, Model 19, 9mm pistol. During subsequent recorded communications, DIXON agreed to get CS-1 in contact with VARGAS.

8. On or about April 15, 2018, CS-1 made recorded phone contact with (573) 353-6565 (a Sprint cell phone used by DERRICK GRAYSON) regarding VARGAS. GRAYSON told CS-1 that "Vic" (VARGAS) had several firearms for sale. Law enforcement later confirmed that the man's voice heard on (573) 353-6565 was that of GRAYSON.

3

9. On or about April 16, 2018, VARGAS called CS-1 from (573) 353-4649 (the telephone number assigned to the Device) regarding firearms for sale, identified himself as "VICTOR," and told CS-1 he had several firearms for sale, including a "Glock 19," a "Glock 20," a "Diamondback AR-9" and a "sniper rifle." Using the Device, VARGAS subsequently sent CS-1 several picture text messages depicting actual firearms for sale and/or other picture text messages depicting similar firearms for sale.

10. On or about April 16, 2018, during a recorded phone conversation with VARGAS on the Device, CS-1 asked VARGAS to meet him halfway between Chicago and Jefferson City in Springfield, Illinois, on April 18, 2018, in order for VARGAS to sell CS-1 four firearms in exchange for approximately $3,200 in U.S. Currency. CS-1 told VARGAS at least twice during their conversation the reason for his request was because CS-1 was "a felon bro."

11. On or about April 16, 2018, VARGAS contacted CS-1 via text message from the Device. VARGAS told CS-1 he had an additional shotgun for sale. VARGAS agreed to sell CS-1 five firearms in exchange for U.S. Currency.

12. On or about April 18, 2018, CS-1 purchased five firearms from VARGAS in exchange for $3,200 in U.S. Currency. Prior to the meeting with VARGAS, CS-1 was searched for contraband and U.S. Currency with negative results. CS-1 (who was accompanied by an Undercover Agent (UCA)) traveled to 1100 Lejune Drive in Springfield, Illinois, in a UC vehicle (UCV). Both UCA and CS-1 were equipped with audio and video recording devices, which were activated. Law enforcement observed both VARGAS and GRAYSON arrive at 1100 Lejune Drive in a grey Toyota Camry. Several law enforcement databases show a 2017 Toyota Camry to be registered to VARGAS in Missouri. Additionally, data base checks show the 2017 Toyota Camry to bear Missouri License Registration # MM4 P6L with VIN # 4T1BF1FK0HU754621.

4

13. Upon VARGAS and GRAYSON's arrival, CS-1 went to the Toyota, where VARGAS removed a large box from the Toyota that contained the five firearms VARGAS had agreed to sell to CS-1. CS-1, VARGAS and GRAYSON entered the UCV, where the UCA was sitting. CS-1 exchanged $3,200 in U.S. Currency with VARGAS for the five firearms. Upon completion of the exchange, VARGAS and GRAYSON exited the UCV, re-entered the Toyota, and departed 1100 Lejune Drive. The box containing the five firearms purchased by CS-1 from VARGAS was turned over to agents. CS-1 was then again searched again for contraband and U.S. Currency with negative results. The shipping label on the box reads: "Ship to: Victor Vargas, 1220 E Elm St, Jefferson City MO 65101-4115."

14. The investigation revealed that CS-1, DIXON and GRAYSON are originally from Chicago, Illinois, and were acquaintances there.

15. On April 21, 2018, ATF S/A Craig Fries contacted a representative from Sprint, who indicated that (573) 353-4649 was an active Sprint telephone number.

16. On or about April 23, 2018, ATF Industry Operations Investigator Matthew R. Corley determined that VARGAS is not a registered Federal Firearms Licensee ("FFL").

17. On or about April 24, 2018, a different ATF Confidential Source (CS-2) (who is a convicted felon) contacted VARGAS on telephone number (573) 353-4649. CS-2 was provided the telephone number for VARGAS by CS-1. During several recorded communications between CS-2 and VARGAS that occurred between April 24, 2018, and April 25, 2018, on the Device, VARGAS agreed to sell CS-2 approximately ten (10) firearms for approximately $7,500 in U.S. Currency. According to recorded communications between CS-2 and VARGAS, on the Device, the $7,500 included approximately $6,000 for the firearms and $1,500 for VARGAS. Furthermore, during a recorded conversation on April 24, 2018, on the Device, CS-2 made

5

VARGAS aware that s/he was a convicted felon. During a recorded conversation on April 24, 2018, on the Device, VARGAS explained to CS-2 that he had built guns and could brush the serial number and repaint it when CS-2 asked about making them untraceable. In the early morning hours of April 25, 2018, pursuant to an order of a United States Magistrate Judge for the Western District of Missouri dated April 24, 2018, an ATF TFO placed a tracking device on a 2017 Toyota Camry registered to VARGAS. During a recorded phone call between CS-2 and VARGAS that occurred on or about April 25, 2018, on the Device, VARGAS and CS-2 agreed to complete the firearms transaction on May 7, 2018.

18. On or about April 30, 2018, CS-2 contacted VARGAS, on the Device, to discuss the pre-arranged firearms sale. During the recorded conversation, on the Device, VARGAS stated he would sell CS-2 an additional rifle for $800. VARGAS agreed to sell CS-2 a total of eleven (11) firearms for $8,300. Later on April 30, 2018, VARGAS contacted CS-2, on the Device, and said that he had ordered the firearms and wanted to do the deal earlier because Friday was his birthday. Later yet on April 30, 2018, VARGAS contacted CS-2, on the Device, and said that he was still awaiting approval and hoped to have the firearms by Friday.

19. On both May 1 and 2, 2018, the tracker on VARGAS' car indicated that the car traveled to River City Pawn, 911 Missouri Boulevard, Jefferson City, Missouri. River City Pawn is a Federal Firearms Licensee ("FFL").

20. On May 1, 2018, VARGAS contacted CS-2, on the Device, to discuss the pre-arranged firearms sale. During the recorded conversation, VARGAS stated that the bank had locked his transaction when he tried to purchase the firearms because of the amount. In a subsequent text message on May 2, 2018, from VARGAS (573-353-4649) to CS-2, VARGAS stated that everything was good and that the firearms would be there on Monday (May 7).

6

21.     On May 2, 2018, VARGAS contacted CS-2, on the Device, to discuss the pre-arranged firearms sale. During the recorded conversation, VARGAS stated that the bank would only let him send $1,000 at a time to pay for the guns, and that they should be ready to sell by Friday (May 11) or Monday (May 14).

22.     On May 5, 2018, VARGAS contacted CS-2, on the Device, to discuss the pre-arranged firearms sale. During the recorded conversation, VARGAS stated that the pistols should be in by Friday (May 11) and talked about building frames. In a subsequent text message to CS-2 on May 5, 2018, on the Device, VARGAS texted that half of the guns were in.

23.     On May 8, 2018, VARGAS again contacted CS-2, on the Device, to discuss the pre-arranged firearms sale. During the recorded conversation, VARGAS stated that ½ of the guns would be ready and he was waiting on the background check to clear for the remaining guns. VARGAS and the CS-2 discussed that CS-2 could travel to VARGAS on Thursday and do the transaction on Friday. VARGAS and the CS agreed upon a final price of $8,100 for eleven (11) firearms. In a text message to CS-2 on May 8, 2018, on the Device, VARGAS texted that he knows how to build untraceable firearms.

24.     On May 9, 2018, ATF Task Force Officer (TFO) Robert Shearer and ATF S/A Phil Pritchett conducted surveillance of VARGAS at River City Pawn, 911 Missouri Boulevard, Jefferson City, Missouri. At approximately 3:35 p.m., VARGAS' car arrived at River City Pawn and Gun Store. TFO Shearer verified that the car was VARGAS' and positively identified VARGAS as he exited the car and entered the store. At approximately 3:43 p.m., VARGAS exited the store and carried a box to his car, which was parked on the northwest side of the store. After placing the box in his car, VARGAS returned to the store. VARGAS exited the store a second time at approximately 3:58 p.m., again carrying a large box. ATF TFO Shearer and S/A Pritchett

7

observed VARGAS place the second box in the left rear passenger seat of his car. At approximately 3:59 p.m., the gun dealer with River City Pawn and Gun contacted S/A Pritchett by phone, and informed S/A Pritchett that VARGAS had just exited the store with the second case of 6 handguns and was in the parking lot preparing to leave. The gun dealer confirmed that VARGAS had purchased 12 firearms from River City Pawn.

25. ATF TFO Shearer and S/A Pritchett left the area of 911 Missouri Boulevard and responded to the area of 1220 East Elm Street, Jefferson City, Missouri. ATF TFO Shearer has confirmed that this location is the residence of VARGAS. ATF TFO Shearer and S/A Pritchett monitored VARGAS using a GPS Vehicle tracker. VARGAS left 911 Missouri Boulevard and travelled north to West Dunklin Street. VARGAS made a right onto West Dunklin Street and travelled east until coming to the intersection of Benton and East Elm Streets. VARGAS turned east on East Elm Street and travelled to his residence at 1220 East Elm Street. ATF TFO Shearer was on foot in the 1200 block of East Elm Street, and observed VARGAS pull into his driveway at approximately 4:07 p.m., exit his car and remove the two boxes containing the 12 firearms he had purchased from River City Pawn and Gun. At approximately 4:12 p.m., ATF TFO Shearer observed VARGAS take the two boxes into his residence at 1220 East Elm Street via the main entry door.

26. After additional recorded communications on the Device, on or about May 11, 2018, the CS obtained eleven (11) firearms from VARGAS in exchange for $8,100.00 US currency. Prior to the meeting with VARGAS, the CS was searched for contraband and US currency, with negative results. The CS, traveled to 401 Supercenter Dr., Jefferson City, Missouri in a vehicle that was searched for contraband and US currency, with negative results. The CS was equipped with both audio and video recording devices, which were activated. Law enforcement

8

observed VARGAS arrive at 401 Supercenter Dr., Jefferson City, Missouri in a grey in color Toyota Camry bearing Missouri Tag # MM4-P6L.

27. Upon VARGAS' arrival, the CS and VARGAS met. The CS exchanged $8,100.00 US currency with VARGAS for the eleven (11) firearms. Upon completion of the transaction, VARGAS was taken into custody by law enforcement without incident at 401 Supercenter Dr., Jefferson City, Missouri. The eleven (11) firearms purchased by the CS from VARGAS were turned over to Agents. The CS and his vehicle were searched again for contraband and US currency with negative results.

28. VARGAS signed a consent to search form for his vehicle. Officers seized the **Device**, one handgun, several rounds of ammunition and receipts for several monetary transactions.

29. As outlined above, VARGAS used the Device to conduct his illegal firearm distribution venture. From conversations heard during consensually recorded calls and texts investigators learned that VARGAS and others, including DIXON, and GRAYSON used phone calls and text messages to communicate with each other in order to conduct illegal sales of firearms. In short, the use of the Device facilitated the VARGAS' illegal sale of firearms in a way that his business could not have been conducted without the use of the Device.

30. On May 12, 2018, a Complaint was filed, alleging that VARGAS sold eleven firearms to a convicted felon on May 11, 2018.

## Technical Terms

31. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device;

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos;

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games;

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision;

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every

computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static - that is, long-term - IP addresses, while other computers have dynamic - that is, frequently changed - IP addresses; and

  f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

32. Based on my training, experience, I know that the Device has the capability to serve as a wireless telephone, send and receive e-mail and text messages, take digital photos and videos, serve as a computer that stores data, including photos, videos and messages, broadcast GPS navigation data, and access the internet through an IP address. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, as well as evidence of participation in and commission of the crime being investigated.

### Electronic Storage and Forensic Analysis

33. Based on my knowledge, training and experience, I know that the Device can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Device. This information can sometimes be recovered with forensics tools.

34. Forensic evidence. As further described in Attachment A, I seek permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purposes of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

      a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file);

      b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence;

      c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when;

      d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant; and

      e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

### Nature of the Examination

35.      Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire media that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

36.      I submit that this affidavit supports probable cause for a warrant to search the Device, and seize the items described in Attachment A.

Case 2:18-sw-03051-DPR   Document 1-1   Filed 05/15/18   Page 12 of 13

37. The facts set forth in this affidavit are true and correct to the best of my knowledge and belief.

FURTHER, Affiant sayeth not.

_____
**Colleen Peery**
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn to and subscribed before me, on this, the 15th day of May, 2018.

_____
**David P. Rush**
United States Magistrate Judge

13

Case 2:18-sw-03051-DPR   Document 1-1   Filed 05/15/18   Page 13 of 13